**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF GEORGIA**
**COLUMBUS DIVISION**

| | |
|---|---|
| JOHN SOLAK on Behalf of Himself and All Others Similarly Situated, | ) Civil Action No.   4:16-cv-154 (CDL) |
| | ) |
| Plaintiff, | ) <u>CLASS ACTION</u> |
| | ) |
| v. | ) |
| | ) |
| S. DAVID PASSMAN III, ROLAND C. SMITH, JEFFREY W BERKMAN, JAMES A. FLEMING, PATRICIA A. WILSON, MARK R. BELL, SEAN T. ERWIN, AMC ENTERTAINMENT HOLDINGS, INC., and CONGRESS MERGER SUBSIDIARY, INC., | ) |
| | ) |
| | ) |
| Defendants. | ) |
| | ) |

**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**
**<u>AND BREACH OF FIDUCIARY DUTY</u>**

Plaintiff John Solak ("Plaintiff"), on behalf of himself and all others similarly situated, by and through his undersigned counsel, alleges the following upon information and belief, including the investigation of counsel and review of publicly available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge.

**<u>NATURE OF THE ACTION</u>**

1.      This is a stockholder class action brought by Plaintiff on behalf of the public stockholders of Carmike Cinemas, Inc. ("Carmike" or the "Company") against the Company's Board of Directors (the "Board" or the "Individual Defendants"), AMC Entertainment Holdings, Inc. ("AMC"), and Congress Merger Subsidiary, Inc. ("Merger Sub") (the Board, AMC, and Merger Sub are collectively referred to herein as the "Defendants").  This action seeks to enjoin the Individual Defendants from further breaching their fiduciary duties in their pursuit of a sale

of the Company at an unfair price through an unfair process that was tilted in favor of AMC (the "Proposed Acquisition").

2.     On March 3, 2016, Defendants issued a press release announcing that the Board had agreed to sell Carmike to AMC.  According to the press release, AMC will acquire all of the outstanding common stock of Carmike for $30 per share in cash (the "Proposed Consideration"), in a transaction valued at approximately $1.1 billion.  The Proposed Acquisition undervalues Carmike and is marred with preclusive deal protections that effectively prevent the Company from receiving a superior offer.

3.     Carmike is a leader in digital cinema, 3-D cinema deployments, and alternative programming, and is one of the largest motion picture exhibitors in the United States.  The Company has 276 theatres with 2,954 screens in forty-one states.

4.     Carmike has repeatedly demonstrated tremendous financial success and growth. In fact, over the past several years, Carmike's admissions revenue growth per screen has consistently outpaced the industry.  The Company also recently announced record results across several key financial metrics, including, among other things, a 19% rise in operating revenues to an all-time quarterly record of $220.7 million, as well as a rise in operating income of over 100% to $23.7 million.

5.     The Company's impressive growth is expected to continue.  As recently stated by defendant S. David Passman III ("Passman"), the Company's Chief Executive Officer ("CEO"), "We are extremely pleased with our record 2015 fourth quarter and full year financial results and are optimistic about the prospects for 2016."

6.     Despite Carmike's continued success and impressive admissions revenues per screen growth, Defendants agreed to sell the Company to AMC for a meager purchase price per

screen of only $372,376.  This price falls well below both the median and average per screen price of $497,002 and $544,632, respectively, for the six other precedent transactions occurring in the industry between 2012 and the present.

7.     Additional factors further demonstrate the inadequacy of the Proposed Consideration.  For example, at least three analysts have long set target prices for Carmike that are well above the offer price of $30, with target prices ranging from $33 to $36 the day before the deal was announced.  Accordingly, the Proposed Consideration undervalues the Company.

8.     The Individual Defendants are attempting to prevent Plaintiff and the Class (as defined herein) from realizing the benefits of the Company's impressive financial results and bright future by deciding to sell Carmike now in exchange for the grossly inadequate Proposed Consideration—thus breaching their fiduciary duty to maximize stockholder value in connection with the Proposed Acquisition.

9.     The Individual Defendants are willing to sell now rather than wait for Carmike to reap these long-term benefits or a higher premium in order to gain substantial personal benefits afforded them (but not the Company's public stockholders) in the Proposed Acquisition.  For example, the Proposed Acquisition provides the Individual Defendants with accelerated vesting of unvested options collectively worth nearly $13.7 million.

10.    Exacerbating matters, the Individual Defendants have further breached their fiduciary duties by agreeing to lock up the Proposed Acquisition with deal protection devices that operate collectively to preclude other bidders from making a successful competing offer for the Company, including: (i) a strict "no solicitation" provision that prevents the Company from soliciting other potential acquirers or even continuing discussions and negotiations with potential acquirers; (ii) a "matching rights" provision that also discourages competing proposals by

requiring the Company to allow AMC three business days in which the parties must negotiate to render any alternative bid no longer superior; and (iii) a provision that requires the Company to pay AMC a termination fee of $30 million in order to enter into a transaction with a superior bidder.  Collectively, these provisions substantially and improperly limit the Board's ability to act with respect to investigating and pursuing superior proposals and alternatives.

11.    In an attempt to secure stockholder support for the inadequate Proposed Acquisition, on March 31, 2016, Carmike filed a Preliminary Proxy Statement (the "Proxy") with the U.S. Securities and Exchange Commission ("SEC").  The Proxy, which recommends that Carmike stockholders vote in favor of the Proposed Acquisition, omits and/or misrepresents material information about the financial analysis and projections provided by the Company and its financial advisors, in contravention of sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

12.    In short, the Proposed Acquisition is designed to unlawfully divest Carmike's public stockholders of the Company's valuable assets for grossly inadequate consideration and without fully disclosing all material information concerning the transaction to stockholders.  To remedy Defendants' breaches of fiduciary duty and Exchange Act violations, Plaintiff seeks injunctive relief preventing consummation of the Proposed Acquisition, unless and until the Company adequately discloses all material information concerning the transaction.

## JURISDICTION AND VENUE

13.    This Court has jurisdiction over the claims asserted herein for violations of sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder pursuant to section 27 of the Exchange Act.  This Court has supplemental jurisdiction under 28 U.S.C. §1367.

14. This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

15. Venue is proper in this District pursuant to 28 U.S.C. §1391 because Carmike's principal executive offices are located at 1301 First Avenue, Columbus, Georgia.

## THE PARTIES

**Plaintiff**

16. Plaintiff was a stockholder of Carmike at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Carmike stockholder.

**Non-Defendant**

17. Non-defendant Carmike is a Delaware corporation with principal executive offices located at 1301 First Avenue, Columbus, Georgia.  Carmike is one of the largest U.S. motion picture exhibitors which owns, operates, or has an interest in 275 theaters with 2,938 screens located in forty-one states.  Carmike targets mid-size, non-urban markets with the belief that they provide a number of operating benefits, including lower operating costs and fewer alternative forms of entertainment.  As of December 31, 2015, Carmike had approximately 8,500 full or part-time employees.   Upon completion of the Proposed Acquisition, Carmike will become a wholly-owned subsidiary of defendant AMC.

**Defendants**

18. Defendant Passman is Carmike's President and CEO and has been since June 2009, and a director and has been since June 2003.

19. Defendant Roland C. Smith is Carmike's Chairman of the Board and has been

since June 2009, and a director and has been since April 2002.

20.     Defendant Jeffrey W. Berkman is a Carmike director and has been since November 2009.

21.     Defendant James A. Fleming is a Carmike director and has been since March 2009.

22.     Defendant Patricia A. Wilson is a Carmike director and has been since April 2004.

23.     Defendant Mark R. Bell is a Carmike director and has been since October 2011.

24.     Defendant Sean T. Erwin is a Carmike director and has been since May 2012.

25.     Defendant AMC is a Delaware corporation with principal executive offices located at One AMC Way, 11500 Ash Street, Leawood, Kansas.  Defendant AMC is principally involved in the theatrical exhibition business and owns, operates, or has interests in theatres primarily located in the United States.  As of December 31, 2015, defendant AMC employed approximately 970 full-time employees and 20,330 part-time employees.

26.     Defendant Merger Sub is a Delaware corporation and an indirect wholly-owned subsidiary of defendant AMC.  Upon completion of the Proposed Acquisition, defendant Merger Sub will merge with and into Carmike and cease its separate corporate existence.

## INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

27.     By reason of the Individual Defendants' positions with the Company as officers and/or directors, said individuals are in a fiduciary relationship with Plaintiff and the other stockholders of Carmike and owe Plaintiff and the other members of the Class the duties of good faith, care, and loyalty.

28.     By virtue of their positions as directors and/or officers of Carmike, the Individual

- 6 -

Defendants, at all relevant times, had the power to control and influence, and did control and influence and cause Carmike to engage in the practices complained of herein.

29.     Each of the Individual Defendants is required to act in good faith, in the best interests of the Company's stockholders and with such care, including reasonable inquiry, as would be expected of an ordinarily prudent person.  In a situation where the directors of a publicly traded company undertake a transaction that may result in a change in corporate control, the directors must take all steps reasonably required to maximize the value stockholders will receive rather than use a change of control to benefit themselves.  To diligently comply with this duty, the directors of a corporation may not take any action that:

(a)     adversely affects the value provided to the Company's stockholders;

(b)     contractually prohibits them from complying with or carrying out their fiduciary duties;

(c)     discourages or inhibits alternative offers to purchase control of the Company or its assets;

(d)     will otherwise adversely affect their duty to search and secure the best value reasonably available under the circumstances for the Company's stockholders; or

(e)     will provide the directors and/or officers with preferential treatment at the expense of, or separate from, the public stockholders.

30.     Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Acquisition, violated duties owed to Plaintiff and the other stockholders of Carmike, including their duties of loyalty, good faith, and due care, insofar as they, inter alia, failed to obtain the best price possible under the circumstances before entering into the Proposed Acquisition.

## CLASS ACTION ALLEGATIONS

31.     Plaintiff brings this action pursuant Rule 23 of the Federal Rules of Civil Procedure ("Rule 23"), on behalf of itself and all other public stockholders of Carmike that have been or will be harmed by Defendants' conduct described herein (the "Class").  Excluded from the Class are Defendants and any individual or entity affiliated with any Defendant.

32.     This action is properly maintainable as a class action.

33.     The Class is so numerous that joinder of all members is impracticable.  As of March 2, 2016, there were over 24.5 million shares of Carmike common stock issued and outstanding.  The actual number of public stockholders of Carmike can be ascertained through discovery.

34.     There are questions of law and fact which are common to the Class, including, inter alia, the following:

(a)     whether Defendants have violated sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder by disseminating a materially false and misleading Proxy to Carmike stockholders;

(b)     whether the Individual Defendants, in bad faith and for improper motives, impeded or erected barriers designed to discourage other potentially interested parties from making an offer to acquire the Company or its assets;

(c)     whether Defendants are unjustly enriching themselves and other insiders or affiliates of the Company at the expense of Carmike stockholders and/or their fiduciary obligations; and

(d)     whether Plaintiff and the other members of the Class would be irreparably harmed were the transactions complained of herein consummated.

35.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

36.     Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class.

37.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

38.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## THE FLAWED AND SELF-SERVING SALES PROCESS

39.     As revealed by the Proxy, the Proposed Acquisition is the product of a flawed process that was slanted in favor of AMC from the beginning.  This process began in May 2014 when the then-President and CEO of AMC and AMC's Chief Financial Officer ("CFO") met with defendant Passman and Richard Hare, Carmike's Senior Vice President—Finance, Treasurer, and CFO.  At that meeting, AMC proposed engaging in discussions regarding a potential transaction in which AMC would acquire Carmike in exchange for cash and stock merger consideration.  Thereafter, Carmike purportedly postponed discussions with AMC until after the Company completed a then-pending transaction to acquire another company, Digital

Cinema Destinations Corp. ("Digiplex").

40.     Following the August 2014 closing of the Digiplex transaction, AMC and Carmike quickly resumed discussions.  On August 27, 2014, the Board authorized Carmike to engage J.P. Morgan Securities LLC ("J.P. Morgan") as the Company's financial advisor, and authorized Carmike to enter into a confidentiality agreement with AMC, provide due diligence to AMC, and further discus the transaction with AMC.

41.     Carmike and AMC discussed a potential transaction and engaged in due diligence throughout the rest of 2014.  The Board did not even consider potential mergers with any other strategic buyers until some undisclosed date in December 2014.  At that time, the Board only identified four potential strategic acquirers, which the Proxy refers to as Party A, Party B, Party C, and Party D, and authorized the Company's financial advisor, J.P. Morgan, to solicit interest from such parties.  The Board also determined not to reach out to any potential financial buyers.

42.     During December 2014 and January 2015, J.P. Morgan contacted each of the above-noted parties as well one other potential strategic buyer which was suggested by J.P. Morgan and identified in the Proxy as Party E.  Party A was purportedly the only party that agreed to execute a confidentiality agreement, but declined to pursue talks for undisclosed reasons.

43.     In the first quarter of 2015, AMC and Carmike discussed a potential transaction in which AMC would acquire Carmike for $37 per share, or $7 above the current Proposed Consideration, with 60% of the consideration to be paid in cash and 40% paid in AMC stock. On April 10, 2015, however, for undisclosed reasons, AMC informed Carmike that it was no longer interested in pursuing a potential transaction with the Company.

44.     In December 2015, an AMC executive contacted one of Carmike's Senior Vice

Presidents to revisit a potential transaction. The following month, defendant Passman and AMC's new CEO, Adam M. Aron, discussed the matter and the Board authorized Carmike's senior management to further discuss a potential transaction with AMC's senior management.

45.     Over the next few months, certain of Carmike's senior management, including defendant Passman, continued discussions with senior management at AMC.

46.     On February 5, 2016, AMC's CEO contacted defendant Passman and proposed that AMC would acquire Carmike for $30 per share in cash. The Board held two special meetings over the next ten days to discuss the matter. At the second meeting, on February 15, 2015, the Board instructed J.P. Morgan representatives to contact Party A and Party B to determine if they were interested in potentially acquiring Carmike. The Board determined not to contact Party C, Party D, or Party E, nor to contact any potential financial buyers.

47.     In the following weeks, J.P. Morgan contacted Party A and Party B. Similar to the previous year, Party B informed J.P. Morgan that it was not interested, while Party A again expressed interest, again was given access to certain Carmike data, and then again, for undisclosed reasons, informed J.P. Morgan that it was not interested in pursuing a transaction. During the same time, and continuing into early March 2016, AMC and Carmike continued to negotiate the terms of the proposed merger, and AMC reduced the proposed purchase price from $30 to $29.85 per share.

48.     On March 3, following a special meeting of the Board, Carmike's senior management contacted AMC's senior management to propose increasing the proposed purchase price back to $30 per share. AMC accepted the proposal, and the Board then unanimously approved the Agreement and Plan of Merger (the "Merger Agreement").

## THE OVERLY PROCULSIVE MERGER AGREEMENT

49.    On March 3, 2016, Carmike and AMC issued a press release announcing that the Individual Defendants had agreed to sell Carmike to AMC.  Under the terms of the Merger Agreement, holders of Carmike common stock will receive $30 per share in cash, in a transaction valued at approximately $1.1 billion.  The press release announcing the deal stated, in relevant part:

> AMC Theatres (AMC Entertainment Holdings, Inc.) (NYSE: AMC) ("AMC") and Carmike Cinemas, Inc. (NASDAQ: CKEC) ("Carmike") announced today they have entered into a definitive merger agreement pursuant to which AMC will acquire all of the outstanding shares of Carmike for $30.00 per share in cash. The transaction is valued at approximately $1.1 billion, including the assumption of Carmike net indebtedness. The purchase price per screen is approximately $376,000, and the per share purchase price represents an approximate 19.47% premium to Carmike's March 3, 2016 closing stock price.

> **The Combined Company After Closing the Transaction**

> AMC is one of the nation's premier entertainment companies with 5,426 screens and the most productive theatres in the country's top markets. Carmike, America's hometown theatre circuit, has 2,954 screens, primarily located in mid-size, non-urban communities. Together AMC and Carmike would have well over 600 theatre locations in 45 states across the country, including the District of Columbia. The transaction is expected to provide significant growth for AMC and will allow it to bring its innovative amenities and best-in-class customer experience to enhance the movie-going experience for more customers in more areas.

> **Key Benefits of the Transaction**

> The transaction is expected to result in free cash flow per share accretion, exclusive of one-time transaction-related charges, in 2017 and beyond, and is expected to produce annual cost synergies of approximately $35 million. Other key benefits of the transaction include:

> • Diversifying AMC's footprint by adding theatres with complementary geographic and guest demographic profiles that strengthen the combined company's admissions growth potential with limited geographic overlap;

> • Expanding AMC's proven and successful guest experience strategies to millions of new guests in complementary markets;

- Reducing related General and Administrative expenses by combining back-of-the-house functions such as accounting, finance and technology. The result is a more efficient and effective competitor through greater scale, scope and expertise. The combined company will be headquartered in Leawood, Kansas. Adam Aron will serve as Chief Executive Officer and President, and Craig Ramsey will serve as Executive Vice President and Chief Financial Officer;

- The maintenance of AMC's quarterly dividend;

- The maintenance of AMC's balance sheet flexibility and attractive leverage profile; and

- AMC's receiving substantial additional value in NCM LLC, a subsidiary of National CineMedia, Inc. (NASDAQ: NCMI).

Commenting on the transaction, AMC Chief Executive Officer and President, Adam Aron said, "This is a compelling transaction that brings together two great companies with complementary strengths to create substantial value for our guests and shareholders. Through this transaction we expect to unlock synergies, sufficient we believe to make this transaction accretive in 2017. AMC also gets to extend the reach of our innovative, guest-experience strategies to further transform the movie-going experience for millions of new guests. We also look forward to welcoming so many talented Carmike employees to the AMC team."

"Our combination with AMC is a transformative milestone for Carmike and one that provides significant value to Carmike shareholders," stated David Passman, Carmike President and Chief Executive Officer. "By joining with AMC, we are bringing together two highly complementary theatre footprints and a shared commitment to service and innovation, positioning the combined company to deliver an even more compelling movie-going experience in many more locations across the country. I am proud of the Carmike employees whose dedication and hard work have made this combination and its many benefits possible. We look forward to working together with the AMC team to complete the transaction and to ensure a seamless transition."

Aron added, "By broadening AMC's geographic and demographic base for delivering our groundbreaking guest experience innovations in comfort and convenience -- such as plush power-recliners, enhanced food and beverage, premium sight and sound, greater guest engagement and targeted programming -- AMC is poised to deliver the best possible movie experience to more movie-goers than ever before."

50.    On March 4, 2016, the Company filed a Current Report on Form 8-K with the

SEC wherein it disclosed the Merger Agreement.  The Merger Agreement contains a number of

draconian deal protection devices designed to preclude any competing bids for Carmike from emerging in the period following the announcement of the Proposed Acquisition, which effectively locked-up the deal in favor of AMC.  As the Individual Defendants were duty bound to maximize stockholder value in connection with the Proposed Acquisition, the inclusion of these provisions, as detailed below, constitutes a further breach of their fiduciary duties.

51.     Under section 6.04 of the Merger Agreement, Carmike is subject to a no-solicitation clause that prohibits the Company from seeking a superior offer for its stockholders. Specifically, section 6.04(a) of the Merger Agreement states, in pertinent part:

Section 6.04. *No Solicitation; Other Offers.*

(a) Except as provided by the remainder of this Section 6.04, from the date hereof until the Effective Time or, if earlier, the termination of this Agreement in accordance with Article 10, neither the Company nor any of its Subsidiaries nor any of their respective officers or directors shall, and the Company and its Subsidiaries shall not authorize any of its other Representatives to, directly or indirectly, (i) solicit, initiate or take any action to knowingly facilitate or knowingly encourage any inquiries or the making of any proposal or offer that constitutes, or would reasonably be expected to lead to, any Acquisition Proposal, including by way of furnishing any non-public information or data concerning the Company or its Subsidiaries or any assets owned (in whole or part) by the Company or its Subsidiaries to any Person in furtherance of an Acquisition Proposal or if it would reasonably be expected to lead to an Acquisition Proposal or (ii) enter into, continue or otherwise participate in any discussions or negotiations with, or afford access to the business, properties, assets, books or records of the Company or any of its Subsidiaries to, any Third Party with respect to any potential Acquisition Proposal, (iii) enter into any agreement in principle, memorandum of understanding, letter of intent, merger agreement, acquisition agreement, joint venture agreement, option agreement or other similar agreement (but excluding an Acceptable Confidentiality Agreement) providing for a transaction that is the subject of an Acquisition Proposal (an "**Alternative Acquisition Agreement**"), or (iv) grant any waiver, amendment or release under any standstill or confidentiality agreement concerning an Acquisition Proposal; *provided* that notwithstanding the foregoing and the last sentence of this Section 6.04(a) the Company shall be permitted to waive, amend, release or fail to enforce any provision of any confidentiality, "standstill" or similar obligation of any Person if the Board of Directors of the Company determines in good faith, after consultation with its outside legal counsel, that the failure to take such action would be inconsistent with its fiduciary duties under Applicable Law. The Company shall, and shall cause each of its Subsidiaries and its and their

respective Representatives to, cease immediately and cause to be terminated any and all activities, discussions or negotiations, if any, existing as of the date of this Agreement with any Third Party and its Representatives with respect to any Acquisition Proposal or that would reasonably be expected to lead to an Acquisition Proposal. The Company shall use its commercially reasonable efforts to promptly inform its Representatives of the obligations in this Section 6.04. The Company also agrees that it will promptly request each Person that has executed a confidentiality agreement prior to the date hereof in connection with its consideration of acquiring the Company or any of its Subsidiaries to return or destroy (as provided in the terms of such confidentiality agreement) all confidential information furnished to such Person prior to the date hereof by or on behalf of it or any of its Subsidiaries. The Company and its Subsidiaries shall use commercially reasonable efforts to enforce any confidentiality agreements entered into with any Person in connection with any Acquisition Proposal if requested to do so by Parent, subject to the remaining provisions of this Section 6.04.

52.     Furthermore, under section 6.04(f) of the Merger Agreement, should it receive an unsolicited bid, the Company must notify AMC of the bidder's offer and all changes thereto. Thereafter, should the Board determine that the unsolicited offer is superior, AMC is granted three business days to amend the terms of the Merger Agreement to make a counter offer that only needs to be as favorable to the Company's stockholders as the unsolicited offer. AMC will be able to match the unsolicited offer because it is granted unfettered access to the unsolicited offer, in its entirety, eliminating any leverage the Company has in receiving the unsolicited offer.

53.     Also, pursuant to section 11.04(b) of the Merger Agreement, Carmike must pay AMC an exorbitant $30 million termination fee if it accepts a superior proposal. The termination fee represents approximately 4.1% of the total equity value of the Proposed Acquisition and increases the amount that a competing bidder would have to offer to acquire the Company by at least $1.22 per share before it would even potentially qualify as a superior proposal under the Merger Agreement.

54.     Collectively, these unfair deal protection devices operate in conjunction to ensure that no competing offers will emerge for the Company and that the patently inadequate Proposed Acquisition is consummated, thereby guaranteeing that the Individual Defendants (along with

certain other officers of Carmike) will secure the personal financial benefits they negotiated for themselves in connection with the consummation of the Proposed Acquisition.  Accordingly, the Individual Defendants' efforts to put their own personal interests before those of the Company's stockholders have resulted in the Proposed Acquisition being presented to Carmike stockholders at an untenable and inadequate offer price which, arguably, cannot be topped by a competing bidder.

### THE PROPOSED ACQUISITION UNDERVALUES CARMIKE

55.     The Individual Defendants' fiduciary duties require them to maximize stockholder value when entering into a change-in-control transaction such as the Proposed Acquisition. Here, however, the Individual Defendants' eagerness to enter into an acquisition with AMC due to their conflicted status resulted in a sales process that was not designed to obtain the maximum price for Carmike stockholders.  As a result, the Company's public stockholders have been, and will continue to be, denied the fair process and arm's-length negotiated terms to which they are entitled to in a sale of their Company.  Indeed, the Proposed Consideration does not reflect the true inherent value of the Company as known to the Individual Defendants and AMC.

56.     Carmike is highly successful and poised for continuing growth.  For years the Company's admissions revenue growth per screen has consistently outpaced the industry, and the Carmike is showing no signs of slowing down.  Carmike continued this trend in the third quarter of 2015 when the Company's admissions revenues per screen grew nearly 9%, outperforming the industry by approximately 290 basis points.  The Company continued with this trend in the fourth quarter of 2015 with admissions revenue growth per screen of over 15%, and 9% for the full year, which outpaced the industry by almost 500 and 200 basis points, respectively.

57.     The Company also recently announced record results for the fourth quarter and year end of 2015 across several key financial metrics.  For example, Carmike experienced a

staggering 19% rise in operating revenues to an all-time quarterly record of $220.7 million.  The Company also enjoyed as a substantial rise in operating income of over 100%, which drove increases in adjusted earnings before interest, taxes, depreciation, and amortization ("EBITDA") and theatre level cash flow of approximately 61% and 51%, respectively.

58.     The Company's impressive growth is expected to continue.  As recently stated by defendant Passman, "Carmike's record fourth quarter and 2015 full year financial results reflect the ongoing success of our theatre-level initiatives, the progress we are achieving with our value-building theatre acquisition and organic growth strategies and the overall strength of the U.S. box office….  We are extremely pleased with our record 2015 fourth quarter and full year financial results and are optimistic about the prospects for 2016."

59.     Despite Carmike's continued success and impressive admissions revenues per screen growth, Defendants agreed to sell the Company to AMC for a meager purchase price per screen of only $372,376.  As detailed in the following chart, this price falls well below both the median and average per screen price of $497,002 and $544,632, respectively, for the six other precedent transactions occurring in the industry between 2012 and the present:

| Date | Target | Acquirer | Transaction Value | # of Screens | Per Screen Value |
|---|---|---|---|---|---|
| 10/6/2015 | Sundance Cinemas LLC | Carmike Cinemas, Inc. | $ 36,000,000 | 37 | $ 972,973 |
| 7/14/2015 | Starplex Cinemas | AMC Entertainment Holdings, Inc. | $ 172,000,000 | 346 | $ 497,110 |
| 7/14/2013 | Digital Cinemas Destinations Corp. | Carmike Cinemas, Inc. | $ 66,000,000 | 206 | $ 320,388 |
| 2/19/2013 | Hollywood Theaters | Regal Entertainment Group | $ 238,000,000 | 513 | $ 463,938 |
| 11/16/2012 | Rave Cinemas LLC | Cinemark USA Inc. | $ 240,000,000 | 483 | $ 496,894 |
| 5/20/2012 | AMC Entertainment Holdings, Inc. | Dalian Wanda Group Co. Ltd | $ 2,600,000,000 | 5,034 | $ 516,488 |
| | | Average | $ 558,666,667 | 1,103 | $ 544,632 |
| | | Median | $ 205,000,000 | 415 | $ 497,002 |

60.     Given Carmike's track record of outstanding performance and expectations of future growth, it is no surprise that analysts highly value the Company.  Indeed, at least three analysts have long set target prices for Carmike that are well above the offer price of $30, with target prices ranging from $33 to $36 the day before the deal was announced.  Specifically: (i)

Topeka Capital Markets Inc. has had a target price of $36 per share since January 12, 2016, and previously had target prices ranging from $37 to $41 from March 3, 2015 to January 12, 2016; (ii) Wedbush has had a target price of $34 since March 1, 2016, and previously had target prices ranging from $34 to $40 from May 6, 2015 to July 27, 2015; and (iii) B. Riley & Co. has had a target price of $33 since March 1, 2016, and previously had target prices ranging from $32 to $39.50 from July 2, 2015 to December 28, 2015.  Of note, analysts have a track record of underestimating Carmike's financial performance.  Indeed, Carmike has beat consensus analyst estimates for sales in three out of its last four quarters.

61.    Unfortunately for the Company's stockholders, the Board approved the Proposed Acquisition at a meager price of $30 per share.

## THE INDIVIDUAL DEFENDANTS' INTERESTS IN THE PROPOSED ACQUISITION

62.    The Individual Defendants disloyally placed their own interests first, and tailored the terms and conditions of the Proposed Acquisition to meet their own personal needs and objectives.  Upon closing of the Proposed Acquisition, Carmike's Board will receive nearly $20 million, including the accelerated vesting of restricted options collectively worth about $13.7 million:

| Defendants | Common Share Consideration | Accelerated Consideration | Total Merger Consideration |
|---|---|---|---|
| S. David Passman III | $    2,323,170.00 | $ 13,192,300.00 | $  15,515,470.00 |
| Roland C. Smith | $    1,226,580.00 | $        89,340.00 | $    1,315,920.00 |
| Jeffrey W. Berkman | $       509,220.00 | $      176,550.00 | $       685,770.00 |
| James A. Fleming | $       722,220.00 | $        59,550.00 | $       781,770.00 |
| Patricia A. Wilson | $       804,720.00 | $        59,550.00 | $       864,270.00 |
| Mark R. Bell | $       432,090.00 | $        59,550.00 | $       491,640.00 |
| Sean T. Erwin | $       279,510.00 | $        59,550.00 | $       339,060.00 |
| **Total** | **$    6,297,510.00** | **$ 13,696,390.00** | **$  19,993,900.00** |

In addition, certain of the Company's officers will receive millions of dollars in change-in-control payments in connection with the Proposed Acquisition.  For example, defendant Passman will receive close to $3 million in cash severance and other benefits.

63.     By negotiating for such personal benefits in connection with the consummation of the Proposed Acquisition, the Individual Defendants placed their own personal interests before those of the Company's stockholders, thus resulting in the Proposed Acquisition being presented to Carmike stockholders at an untenable and inadequate offer price.

## THE FALSE AND MATERIALLY MISLEADING PROXY

64.     In order to secure stockholder approval of the unfair Proposed Acquisition, Defendants filed the false and materially misleading Proxy with the SEC on March 31, 2016. The Proxy misrepresents and/or omits material information necessary for Carmike stockholders to make an informed decision whether to vote in favor of the Proposed Acquisition.  Specifically, as set forth below, the Proxy fails to provide Company stockholders with material information and/or provides them with materially misleading information concerning the valuation analysis and future projections prepared by the Company and its financial advisor, J.P. Morgan.

**Materially Incomplete and Misleading Disclosures Regarding the Flawed Process**

65.     The Proxy fails to disclose material information regarding the process leading up to the signing of the Merger Agreement.  These omissions render the relevant passages of the Background of the Merger section detailed below materially misleading.

66.     According to the Proxy at page 41, "[o]n April 10, 2015, after further discussions between the parties on a number of issues related to the transaction, AMC informed Carmike that it was no longer interested in pursuing a potential transaction with Carmike."   The Proxy, however, fails to disclose the reasons that AMC was no longer interested in pursuing a transaction.  This information is vital in determining whether the Proposed Consideration was

fair and adequate, especially given that AMC's expression of disinterest was made during the same time-frame that the parties were discussing an offer price of $37 per share, significantly higher than the ultimately agreed upon Proposed Consideration of $30 per share.

67.    The Proxy also discloses on page 41 that in December 2015, three financial sponsors expressed interest in consummating potential transactions with Carmike.  Specifically, the Proxy states:

> At an industry conference in December 2015, members of Carmike's senior management received inquiries from three financial sponsors. One such inquiry concerned Carmike's interest in a "private investment in public equity" (PIPE) transaction or investment in Carmike, with the other two inquiries concerning Carmike's interest in a "going private" leveraged transaction. Carmike's senior management reported these inquiries to the Board.

The Proxy, however, fails to disclose whether Carmike and/or its advisers had any further contact with any of the three financial sponsors that had expressed an interest in a strategic transaction.  Discloser of this information is highly material in determining whether the Board adequately explored all available strategic alternatives in light of its duty to maximize stockholder value.

68.    According to the Proxy at page 44, during a special meeting of the Board that was held on February 15, 2016, the Board "reviewed Carmike's growth strategy, including its internal growth strategy and its theatre acquisition strategy, and the opportunities, challenges and risks associated with executing Carmike's growth strategy."  The Proxy, however, fails to disclose any specifics concerning the "opportunities, challenges and risks associated with executing Carmike's growth strategy" that were reviewed by the Board.  Disclosure of this information is vital in determining whether the Proposed Consideration is fair in light of Carmike's growth potential, and whether the Board was fully and adequately informed of the Company's growth potential prior to approving the Proposed Acquisition on March 3, 2016.

69.     Each of the above-referenced omissions are material because they directly relate to the process the Board took to obtain adequate or fair value for the benefit of Carmike stockholders and whether the Board inappropriately steered the process toward a deal with AMC to the detriment of the Company's stockholders.

**The Proxy Fails to Disclose Key Financial Metrics Underlying J.P. Morgan's Analysis and Projections**

70.     The Proxy cites to and annexes the opinions of Carmike's financial advisor, J.P. Morgan, which concludes that the consideration to be received by the holders of Carmike common stock in the Proposed Acquisition is fair, from a financial point of view, to such holders.  However, the Proxy fails to disclose material information about J.P. Morgan's opinions and methodologies, rendering it impossible for Company stockholders to effectively evaluate, and determine how to vote with respect to, the Proposed Acquisition.

71.     With respect to J.P. Morgan's *Public Trading Multiples*, on pages 55-57 of the Proxy, for each of the selected public companies analyzed by J.P. Morgan, the Proxy fails to disclose: (i) Equity Value ("EV")/Calendar Year ("CY") 2016 Estimated ("E") EBITDA; (ii) EV/CY 2017E EBITDA; and (iii) whether J.P. Morgan performed any type of benchmarking analysis for Carmike in relation to the selected public companies.

72.     The omission of this information renders the following statements from page 56 of the Proxy false and/or materially misleading in contravention of the Exchange Act:

> Using publicly available information, J.P. Morgan calculated, for each selected company, the ratio of the company's firm value (calculated as the market value of the company's common stock on a fully diluted basis, plus any debt and minority interest, less unconsolidated investments and cash and cash equivalents) to the consensus equity research analyst estimate for the company's EBITDA (calculated as earnings before interest, tax, depreciation and amortization) for the years ending December 31, 2016, which we refer to in this proxy statement as the "2016E FV/EBITDA," and December 31, 2017, which we refer to in this proxy statement as the "2017E FV/EBITDA."

Based on the results of this analysis, J.P. Morgan selected (1) multiple reference ranges for 2016E FV/EBITDA of 7.0x − 8.0x and (2) multiple reference ranges for 2017E FV/EBITDA of 6.5x − 7.5x.

After applying such ranges to the projected EBITDA for Carmike for the years ending December 31, 2016 and December 31, 2017 based on March 2016 Projections—Without Acquisitions, the analysis indicated the following implied per share equity value ranges for Carmike common stock:

**Implied Per Share Equity Value Ranges: March 2016 Projections—Without Acquisitions**

|  | Implied Per Share Equity Value | |
|---|---|---|
|  | Low | High |
| 2016E FV/EBITDA | $     22.15 | $     27.30 |
| 2017E FV/EBITDA | $     24.55 | 30.50 |

After applying such ranges to the projected EBITDA for Carmike for the years ending December 31, 2016 and December 31, 2017 based on March 2016 Projections—With Acquisitions, the analysis indicated the following implied per share equity value ranges for Carmike common stock:

**Implied Per Share Equity Value Ranges: March 2016 Projections—With Acquisitions**

|  | Implied Per Share Equity Value | |
|---|---|---|
|  | Low | High |
| 2016E FV/EBITDA | $     23.65 | $     29.00 |
| 2017E FV/EBITDA | $     30.20 | 36.95 |

After applying such ranges to the consensus equity research analyst projection of EBITDA for Carmike for the years ending December 31, 2016 and December 31, 2017, the analysis indicated the following implied per share equity value ranges for Carmike common stock:

**Implied Per Share Equity Value Ranges—Consensus Equity Research Analyst Projection**

|  | Implied Per Share Equity Value | |
|---|---|---|
|  | Low | High |
| 2016E FV/EBITDA | $     24.65 | $     30.15 |
| 2017E FV/EBITDA | $     24.75 | 30.70 |

73.    These statements in the Proxy are rendered false and/or misleading by the omissions identified in ¶71 because such omissions are essential to stockholders' ability to properly evaluate the analysis performed by J.P. Morgan.  For example, without the individually observed multiples, stockholders are unable to determine for themselves whether the multiples

applied to the financials for Carmike are representative of the selected comparable companies (or groups of selected comparable companies) that are most similar to Carmike.  Moreover, much like disclosing individual multiples for the selected companies provides greater visibility on the differences between companies and selected companies groups, disclosing benchmarking metrics provides clarity on operating and financial metrics by which Carmike can be benchmarked against the selected companies.  Without the benchmarking metrics, it is difficult to determine the process J.P. Morgan used to select the valuation multiples in this analysis.  Without the benefit of knowing whether J.P. Morgan performed a benchmarking analysis to account for differences between Carmike and the comparable entities it selected, the stockholders' ability to understand this analysis is significantly limited, rendering them unable to make a fully-informed decision whether to vote to approve the Proposed Acquisition.

74.     With respect to J.P. Morgan's *Selected Transactions Analysis*, on pages 57-58 of the Proxy, the Proxy fails to disclose: (i) the following individual transaction equity value for the last twelve months EBITDA multiples for each of the selected transactions analyzed by J.P. Morgan; and (ii) whether J.P. Morgan performed any type of benchmarking analysis for Carmike in relation to the selected transactions.

75.     The omission of this information renders the following statements from page 58 of the Proxy false and/or materially misleading in contravention of the Exchange Act:

> Using publicly available information, J.P. Morgan calculated, for each selected transaction, the ratio of the transaction value to the target company's EBITDA for the twelve-month period prior to announcement of the applicable transaction, which we refer to in this proxy statement as the "TV/LTM EBITDA."

> Based on the results of this analysis, J.P. Morgan selected TV/LTM EBITDA multiples of 7.0x and 8.5x and applied them to the EBITDA of Carmike for the year ended December 31, 2015. This analysis indicated the following implied per share equity value range for Carmike's common stock:

|  | Implied Per Share Equity Value | |
| --- | --- | --- |
|  | Low | High |
| TV/LTM EBITDA for the year ended December 31, 2015 | $   20.85 | $   28.30 |

76.     These statements in the Proxy are rendered false and/or misleading by the omissions identified in ¶74 because this information is necessary for stockholders to understand and gauge the weight of the multiples derived from these transactions.

77.     With respect to J.P. Morgan's *Discounted Cash Flow Analysis*, on pages 58-59 of the Proxy, the Proxy fails to disclose: (i) how, if at all, J.P. Morgan incorporated Carmike's net operating losses in this analysis; and (ii) the net debt utilized by J.P. Morgan in this analysis.

78.     The omission of this information renders the following statements from page 59 of the Proxy false and/or materially misleading in contravention of the Exchange Act:

> J.P. Morgan calculated the unlevered free cash flows that Carmike is expected to generate during fiscal years 2016 through 2025 based upon financial projections prepared by the management of Carmike using each of March 2016 Projections—Without Acquisitions and March 2016 Projections—With Acquisitions. For each set of projections, J.P. Morgan also calculated a range of terminal values of Carmike at the end of the ten-year period ending 2025 by applying a perpetual growth rate ranging from 1.0% to 2.0% to the unlevered free cash flow of Carmike during the terminal period of the projections. The unlevered free cash flows and the range of terminal values were then discounted to present values as of December 31, 2015 using a range of discount rates from 7.0% to 8.0%. This discount rate range was based upon J.P. Morgan's analysis of the capital structures and costs of equity and debt of Carmike and its publicly traded comparable companies.

> Based on the foregoing, this analysis indicated the following implied per share equity value ranges for Carmike's common stock for each of March 2016 Projections—Without Acquisitions and March 2016 Projections—With Acquisitions:

|  | Implied Per Share Equity Value | |
| --- | --- | --- |
|  | Low | High |
| March 2016 Projections—Without Acquisitions | $   23.35 | $   34.70 |
| March 2016 Projections—With Acquisitions | $   24.90 | $   40.85 |

79.     These statements in the Proxy are rendered false and/or misleading by the omissions identified in ¶77 because this information is material and necessary for Carmike stockholders to have a fair summary of the financial analysis performed by J.P. Morgan.

**The Proxy Fails to Disclose Material Projections Prepared by Carmike's Management and Relied upon by J.P. Morgan and the Board**

80.    According to the Proxy, J.P. Morgan and the Board reviewed several financial projections prepared by Carmike's management and relied upon by J.P. Morgan and the Board commensurate with their analysis of the Proposed Acquisition, including projections created in February 2015, December 2015, and March 2016.  The Proxy, however, fails to disclose several key metrics that were used to prepare these projections for fiscal years 2015-2025, including the following items:

>       (a)       taxes (or tax rate);
>
>       (b)       capital expenditures;
>
>       (c)       changes in net working capital;
>
>       (d)       stock-based compensation expense;
>
>       (e)       any other adjustments to unlevered free cash flow;
>
>       (f)       total screens operated (breakdown between existing vs. acquired);
>
>       (g)       EBITDA contributed by acquisitions; and
>
>       (h)       assumed EBITDA multiple or price/screen of acquired theaters.

81.    The failure to include this material information in the Proxy renders the Proxy false and/or misleading as this information is integral to stockholders' evaluation of the consideration being offered in the Proposed Acquisition.  Indeed, these financial projections provide a sneak peek into Carmike's expected future performance (i.e., growth/profitability) and, consequently, its value as a standalone entity.  More importantly, however, this expected performance is more reliable than similar forecasts prepared by third-party analysts and other non-insiders as it comes from members of corporate management who have their fingers on the pulse of the Company.  Accordingly, it is no surprise that financial projections are among the

most highly sought after disclosures by stockholders in the context of corporate transactions such as this.

## COUNT I

### Against All Defendants for Violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9 Promulgated Thereunder

82.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

83.     During the relevant period, Defendants disseminated the false and misleading Proxy specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

84.     By virtue of their positions within the Company, the Defendants were aware of this information and of their duty to disclose this information in the Proxy.  The Proxy was prepared, reviewed, and/or disseminated by the Defendants.  It misrepresented and/or omitted material facts, including material information about the unfair sales process for the Company, the unfair consideration offered in the Proposed Acquisition, and the actual intrinsic value of the Company's and AMC's assets.  The Defendants were at least negligent in filing the Proxy with these materially false and misleading statements.

85.     The omissions and false and misleading statements in the Proxy are material in that a reasonable stockholder would consider them important in deciding how to vote on the Proposed Acquisition.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to stockholders.

86.     By reason of the foregoing, the Defendants have violated section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

87.     Because of the false and misleading statements in the Proxy, Plaintiff and the Class are threatened with irreparable harm, rendering money damages inadequate.  Therefore, injunctive relief is appropriate to ensure Defendants' misconduct is corrected.

<u>COUNT II</u>

**Against the Individual Defendants for Violation of Section 20(a) of the Exchange Act**

88.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

89.     The Individual Defendants acted as controlling persons of Carmike within the meaning of section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Carmike and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

90.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

91.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  The Proxy at issue contains the unanimous

recommendation of each of the Individual Defendants to approve the Proposed Acquisition. They were, thus, directly involved in the making of this document.

92.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Acquisition.   The Proxy purports to describe the various issues and information that they reviewed and considered—descriptions which had input from the directors.

93.     By virtue of the foregoing, the Individual Defendants have violated section 20(a) of the Exchange Act.

94.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated section 14(a) and SEC Rule 14a-9, promulgated thereunder, by their acts and omissions as alleged herein.   By virtue of their positions as controlling persons, these Defendants are liable pursuant to section 20(a) of the Exchange Act.   As a direct and proximate result of Defendants' conduct, Carmike's stockholders will be irreparably harmed.

## COUNT III

### Against the Individual Defendants for Breach of Fiduciary Duties

95.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

96.     The Individual Defendants have violated the fiduciary duties of care, loyalty, and good faith owed to the public stockholders of Carmike and have acted to put their personal interests ahead of the interests of Carmike's stockholders.

97.     By the acts, transactions, and course of conduct alleged herein, the Individual Defendants, individually and acting as a part of a common plan, are attempting to unfairly deprive Plaintiff and the other members of the Class of the true value of Carmike.

98.    The Individual Defendants have violated their fiduciary duties by entering Carmike into the Proposed Acquisition without regard to the effect of the Proposed Acquisition on Carmike's stockholders.

99.    As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required and breached their duty of loyalty owed to the stockholders of Carmike because, among other reasons:

     (a)    they failed to take steps to maximize the value of Carmike to its public stockholders;

     (b)    they failed to properly value Carmike and its various assets and operations; and

     (c)    they ignored or did not protect against the numerous conflicts of interests resulting from the Individual Defendants' own financial stakes in the Proposed Acquisition.

100.    Because the Individual Defendants control the business and corporate affairs of Carmike, and have access to private corporate information concerning Carmike's assets, business, and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the public stockholders of Carmike that makes it inherently unfair for them to pursue and recommend the Proposed Acquisition wherein they will reap disproportionate benefits to the exclusion of maximizing stockholder value.

101.    By reason of the foregoing acts, practices, and course of conduct, the Individual Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary duties toward Plaintiff and the other members of the Class.

102.     The Individual Defendants are engaging in self-dealing, are not acting in good faith toward Plaintiff and the other members of the Class, and have breached and are breaching their fiduciary duties to the Class.

103.     As a result of the Individual Defendants' unlawful actions, Plaintiff and the other members of the Class will be irreparably harmed in that they will not receive their fair portion of the value of Carmike's assets and operations.  Unless the Proposed Acquisition is enjoined by the Court, the Individual Defendants will continue to breach their fiduciary duties owed to Plaintiff and the members of the Class, and may consummate the Proposed Acquisition, all to the irreparable harm of the members of the Class.

104.     Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT IV

### Against Defendants AMC and Merger Sub for Aiding and Abetting Breaches of Fiduciary Duty

105.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

106.     Defendants AMC and Merger Sub knowingly assisted the Individual Defendants' breaches of fiduciary duties in connection with the Proposed Acquisition, which, without such aid, would not have occurred.  In connection with discussions regarding the Proposed Acquisition, Carmike provided, and Defendants AMC and Merger Sub obtained, sensitive, non-public information concerning Carmike, and thus had unfair advantages that are enabling defendant AMC to acquire the Company at an unfair and inadequate price.

107.     As a result of this conduct, Plaintiff and the other members of the Class have been and will be damaged in that they have been and will be prevented from obtaining a fair price for their Carmike shares.

108.     As a result, Plaintiff and the Class members are being irreparably harmed.

109.     Plaintiff and the Class have no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands injunctive relief in his favor and in favor of the Class and against Defendants as follows:

A.     Declaring that this action is properly maintainable as a class action;

B.     Enjoining Defendants, their agents, counsel, employees, and all persons acting in concert with them from consummating the Proposed Acquisition, unless and until they comply with their obligations under sections 14(a) and 20(a) of the Exchange Act to provide stockholders with all material information about the unfair sales process for the Company, the conflicts of interest suffered by Defendants in connection with the Proposed Acquisition, the inadequate consideration offered in the Proposed Acquisition, and the actual intrinsic value of the Company and AMC;

C.     Rescinding, to the extent already implemented, the Merger Agreement or any of the terms thereof;

D.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

E.   Granting such other and further equitable relief as this Court may deem just and proper.

Dated: April 25, 2016                    JOHNSON & WEAVER, LLP


                                         /s/*Michael I. Fistel Jr.*
                                         MICHAEL I. FISTEL JR.

                                         40 Powder Springs Street
                                         Marietta, GA 30064
                                         Telephone: (770) 200-3104
                                         Facsimile: (770) 200-3101
                                         E-mail: michaelf@johnsonandweaver.com

                                         ROBBINS ARROYO LLP
                                         BRIAN J. ROBBINS
                                         STEPHEN J. ODDO
                                         600 B Street, Suite 1900
                                         San Diego, CA 92101
                                         Telephone: (619) 525-3990
                                         Facsimile: (619) 525-3991
                                         E-mail: brobbins@robbinsarroyo.com
                                                 soddo@robbinsarroyo.com

                                         *Attorneys for Plaintiff*

## CERTIFICATION OF PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAW

John Solak ("Plaintiff") declares as to the claims asserted, or to be asserted, under the federal securities laws, that:

1.      Plaintiff has reviewed the class action Complaint and has retained Robbins Arroyo LLP as counsel in this action for all purposes, and authorized the filing of the Complaint.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

3.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are subject of this action:

| SECURITY | TRANSACTION (Purchase/Sale) | QUANTITY | TRADE DATE | PRICE PER SHARE/SECURITY |
|---|---|---|---|---|
| CKEC LAR MIKE CINEMAS | PURCHASE | 50 | 3-8-2016 | 30.33 |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

4.      Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary, and Plaintiff is willing to serve as a lead plaintiff, a lead plaintiff being a representative party who acts on behalf of other class members in directing the action.

Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws within the past three years, unless otherwise stated in the space below:  *Solak v. The Fresh Market, Inc., et al.*, No. 1:16-cv-00249 (D. Del. Apr. 8, 2016)

5.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

6.      Plaintiff represents and warrants that he is fully authorized to enter into and execute this certification.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 22 day of April, 2016.

JOHN SOLAK